### THORP & MARTIN CO. v. HAMILTON-INVINCIBLE, Inc.

No. 7.

District Court, D. Rhode Island.

Jan. 22, 1941.

Joseph H. Coen, of Providence, R. I., for plaintiff.

S. Everett Wilkins, Jr., of Hinckley, Allen, Tillinghast & Wheeler, all of Providence, R. I., for defendant.

HARTIGAN, District Judge.

This is an action of assumpsit brought by Thorp & Martin Company, a Massachusetts corporation, against Hamilton-Invincible, Inc., a Wisconsin corporation, and was commenced in the Superior Court for the County of Providence and State of Rhode Island by a writ of attachment dated October 3, 1938. The ad damnum set forth in the writ is $12,000.

The first count of the plaintiff's declaration sets forth that the defendant on the 3rd day of October, A.D. 1938, was indebted to the plaintiff for work, journeys and attendance of the plaintiff as the agent of and for the defendant, and upon its retainer, and for commission and reward payable to the plaintiff in respect thereof, in the sum of seven thousand five hundred seventy-nine and 74/100 dollars ($7,579.74), and in consideration thereof then and there promised the plaintiff to pay it the same on request.

The second count sets forth that on said date the defendant was justly indebted to the plaintiff in the sum of twelve thousand dollars ($12,000) on book account.

The third count sets forth the defendant was justly indebted to the plaintiff in one other sum of twelve thousand dollars ($12,000) for work, labor, skill, care and diligence there before that time performed and bestowed by the plaintiff for the defendant at the defendant's request; and also for so much money for interest for the forbearance by the plaintiff at the defendant's request, for moneys due and owing from the defendant to the plaintiff, then and there in consideration thereof, promised the plaintiff to pay it said sum of money on request, the which sum though often requested, the defendant hath hitherto refused and still doth refuse to pay.

The defendant filed its answer denying the allegations contained in the plaintiff's declaration and also filed a counterclaim to the effect that the plaintiff for value received executed and delivered to the Welch Invincible Manufacturing Company its promissory note in the amount of five hundred dollars ($500) and that said Welch Invincible Manufacturing Company duly endorsed and delivered the same to the defendant before the commencement of this action; that the defendant is now the holder in due course of said note and that the plaintiff has never paid the same, and prays judgment against the plaintiff in the sum of five hundred dollars ($500).

The plaintiff filed a reply denying it is liable to the defendant as alleged in its counterclaim.

Upon defendant's petition for removal filed in the said Superior Court an order was entered removing the case to this court where it was tried by the court sitting without a jury.

The suit involves the amount of commission due the plaintiff which was the agent of the defendant which was awarded a contract by the City of Providence for certain high school laboratory equipment after the City accepted the defendant's bid.

### Testimony.

Herbert Brooks Crosby, treasurer and principal stockholder of Thorp & Martin Company, testified that while Thorp & Martin Company was acting as an agent for the Welch Invincible Manufacturing Company under a written contract (defendant's exhibit B), he wrote on January 19, 1935, to Mr. R. G. Halvorsen, Welch Invincible Manufacturing Company, Manitowoc, Wisconsin, the following letter: (plaintiff's exhibit 10)

"There are two large Schools being built in Providence, R. I. One, on which the specifications are about ready to come out, is the Mount Pleasant, which handles 2200 pupils and the other is the Mount Hope which will handle 2400.

"We want to write the specifications for all Science and Laboratory equipment for both of these High Schools. The preliminary expense to do this will run $500. and the total expenses, if we follow the order through properly, will, including the initial cost of $500., total 10% of the entire job. These will be the two largest Schools in the New England States.

"I am writing to inquire if you are in a position to advance us the $500. required

to start this job. In our opinion it would be a good investment."

The Welch Invincible Manufacturing Company advanced $500 and Thorp & Martin Company on February 11, 1935, made its promissory note of the following tenor: (defendant's exhibit A)

"$500.00        Boston  Feb. 11 1935

"On demand after date we promise to pay to the order of Welch Invincible Mfg. Co. five hundred........No/100 Dollars Payable at Manitowoc out of earned commission without interest.

"Value received        "Thorp & Martin Company
                    "H. B. Crosby
                        "Treas."

This note was endorsed to defendant and it is not disputed that the amount of it is to be deducted from the plaintiff's earned commission.

The plaintiff did work on the Mount Pleasant High School project over a period of nearly three years and the matter of commission was not discussed again by the parties until October, 1937.

The plaintiff claimed the right to bid the job in its own name but at defendant's request consented to allow the bid to be made in December, 1937, in the name of the defendant.

The plaintiff, also, at the request of the defendant refrained from submitting bids for other items of equipment sold by other companies and of which the plaintiff was an agent and which were to be used in the school and was informed that if it did not submit such bids that the defendant would be fair to the plaintiff.

Mr. Crosby discussed in Boston the matter of plaintiff's commission in the fall of 1937 with Raymond G. Halvorsen, sales engineer of the Hamilton Company, and with James G. Embury, the eastern sales representative of Hamilton, but the parties were never able to agree upon the amount.

Crosby testified that Halvorsen said "that he would not let his engineers do any work in preparing bids on this thing and would not put in any bids until he knew definitely from me how much commission ne must figure in his bid for Thorp & Martin."

The plaintiff demanded fifteen percent and the defendant did not agree to this. The plaintiff then reduced it to ten percent which Halvorsen refused. Finally, Crosby informed Halvorsen that he would take $4,500 and not a cent less and Halvorsen would not agree to this amount.

After this, the defendant put in its bid of $50,531.61 for certain laboratory equipment for the high school and was awarded the contract.

Crosby testified that the regular and customary commission in the trade which is paid by the manufacturer to the agent is fifteen percent. .

The plaintiff offered in evidence a letter (plaintiff's exhibit 1) from the defendant to the plaintiff, under date of July 17, 1935, in regard to quotations for laboratory equipment for a high school in Tewksbury, Mass., part of which reads as follows: "The figures shown in the net F.O.B. factory column include 15% commission for your office."

Plaintiff's exhibit 2, a letter from defendant to plaintiff, under date of May 11, 1935, reads in part: "Your commission included in this proposal is 15% of the F.O.B. factory price, total of which is $1094.97."

Plaintiff's exhibit 3, a letter, under date of August 10, 1937, from the defendant to the plaintiff refers "to your (plaintiff's) regular 15% commission discount."

Plaintiff admitted that it based its claim for commission on the contract (defendant's exhibit B) and that it was not entitled to any commission on the cost of freight, cartage and installation.

Plaintiff admitted that the $500 note should be deducted from whatever commission it received.

Crosby admitted that Halvorsen told him early in December, 1937, that the job would not stand a ten percent commission.

Plaintiff admitted that this was a P.W.A. job and that the lowest responsible bidder would get it.

Crosby claimed that the plaintiff had "the right to fix its commission within up to 15%" and "that is based upon what I understand the sales agreement to mean, and upon the custom of the industry which has been in force for many years."

Plaintiff admitted that it bid on and secured fifteen P.W.A. contracts and did not get fifteen percent on every one and got as low as seven and one-half percent on a $43,000 job.

Crosby denied that Halvorsen quoted him a five percent commission for the plaintiff before bidding the job.

Crosby claimed that Embury said the defendant would do as well as it could on the matter with the plaintiff and that Embury said this several times.

Raymond G. Halvorsen testified that he was sales engineer for the defendant and that he acted in the same capacity for the Welch Invincible Manufacturing Company before it was discontinued; that Hamilton Invincible, Inc., took over the sales organization of Welch Invincible Manufacturing Company and its sales representatives in various parts of the country and that Thorp & Martin Company represented them in connection with sales in New England.

He testified:

"Q. On what basis? On what arrangements? A. Well, when you speak about an arrangement, I don't know if there was any arrangement except the continuance of an established policy that we had used in the past. We told them that we would be able to furnish laboratory furniture for them and would be glad to quote them.

"Q. I will ask you whether or not the parties continued to operate so far as you understand, under the written agreement, or whether some other arrangement was entered into? A. No other arrangement was entered into and as far as we were concerned we just naturally continued. There was no noticeable effect that I could see. They continued to send jobs, we continued to quote them."

He testified that all items in the Providence contract were "specials" and not regular stock items.

Halvorsen denied that he stated to Crosby on October 22, 1937, that he would not submit a bid on the job until he had reached an agreement with Crosby regarding Thorp & Martin Company's commission.

"Q. What did you say? A. I told Mr. Crosby since he was not willing at that time to agree to a 50-50 split of the sales profit that I would have to think it over and that I would discuss the commission arrangement before I put a bid in."

He admitted discussing commissions again with Crosby after receiving Crosby's letter of December 4, 1937. (plaintiff's exhibit 9)

"Q. What was said by him and you? A. I explained that after reviewing the bids or specifications on P.W.A. work that it was absolutely out of the question to attempt to get a factory price or a sales commission that was reasonable. So at that time it was useless to obtain a bid if we attempted to quote so-called regular prices. Mr. Crosby told me at that time that he would have to have $500, and I told him it was impossible. Well, he got a little bit sore and said it would have to be that. I told him it could not be that and that is the way the meeting ended.

"Q. Do you recall what you did quote him as a commission? A. I told him that it did not seem that we could carry any more than 5%.

"Q. Did he agree to that 5%? A. No.

"Q. Did you agree to the $4500.00? A. No.

"Q. Did you agree to his 10%? A. No.

"Q. You did not at any time and you don't now take the attitude that Thorp & Martin Company was not your agent on this job, do you? A. No, I do not.

"Q. Was there ever any agreement between Thorp & Martin and Hamilton Invincible as to what the commissions would be on P.W.A. jobs? A. I cannot answer that. I don't know.

"You don't recall? A. No, sir."

The defendant produced as a witness Arthur B. Stanley who was engaged in the laboratory equipment business for twenty-one years and who worked on and secured about one hundred P.W.A. jobs. He testified that "during the last three years in P.W.A. contracts it has been impossible to secure a contract if there was more than 5% margin on it."

James G. Embury testified that he was a salesman for the Hamilton Invincible Company in charge of the eastern territory; that he came in contact with the Providence job in April, 1937; that he and Mr. Halvorsen went to Providence where they met a Mr. Konkel, one of Thorp & Martin Company's salesmen, and that they interviewed Providence school officials. Later Embury went to Boston to see Mr. Crosby and that Mr. Crosby made an appointment for him to meet Joseph H. Coen, Esq., the plaintiff's attorney; that he came to Providence and met Mr. Coen who introduced him to Providence school officials and that subsequently he made

many trips to Providence to do work on the job and to get Hamilton items specified by the school officials. He testified that he went to Boston on October 22, 1937, with Halvorsen and had a conference with Crosby and that the parties did not agree on the plaintiff's commission and that Crosby said "that the matter of profit should be left over to a later date and should be discussed further."

He testified to another conference with Crosby in Boston about December 3, 1937, when the specifications came out and that he was not sure that he discussed commissions with Crosby.

"Q. What else did you say to Mr. Crosby and what did he say to you? A. Mr. Crosby said, of course he was interested in other parts of the business and he particularly mentioned the school seating, and I pointed out to Mr. Crosby that while I was not positive what line of seating was being used that I did know that Hamilton specifications were being used in the laboratory work, and consequently, it might be better to lay off the seating and concentrate on laboratory. I also pointed out there were other companies in the same business he was, other dealers, manufacturers and agents who had full lines of equipment, and they might feel that Crosby was being too hoggish in the matter. I thought it would be a matter of good policy not to bid on other parts.

"Q. Did he agree to your suggestion? A. Yes, he did.

"The Court: When you discussed with Mr. Crosby at that conference (Dec. 3) the advisability or desirability of not bidding on other items, was anything discussed about commissions that he might lose if he did not bid on these items? A. Well, I don't remember. It seems to me that I have a faint recollection something was said and that I told Mr. Crosby at the time that we would do the very best we could for him when it came to bidding the job if he confined himself to our items.

"Q. What did Mr. Crosby say in answer to your statement that the company would do the best it could for him? A. Mr. Crosby, I felt sure, felt that we would do as we promised—the best we could for him and we would be perfectly fair in every respect."

## Findings.

I find that the parties by their actions, conduct and from the evidence, mutually adopted the terms of the contract (defendant's exhibit B) as the agreement between the parties.

I find that the defendant did not give the plaintiff definite stipulations of commissions in regard to "specials" as mentioned in paragraph (b) of the contract.

I find that Halvorsen had knowledge as early as January 19, 1935, that the total expenses of the plaintiff would, including the initial cost of $500, total ten percent of the entire job.

I find nothing in the agreement between the parties that allows the defendant to fix the plaintiff's commission at five percent because this was a P.W.A. job.

## Conclusions of Law.

In Wholey Boiler Works v. Lewis, 45 R.I. 441, at page 444, 123 A. 595, at page 597, the Court said: "The primary rule in the construction of contracts is that the court must, if possible, ascertain and give effect to the mutual intention of the parties. State v. McAvoy, 40 R.I. 437, 101 A. 109; 13 C.J. 521. The intention of the parties is to be deduced from the language employed by them, and the terms of the contract, when not ambiguous, are conclusive, in the absence of the averment and proof of mistake, the question being, not what intention existed in the minds of the parties, but what intention is expressed by the language used. 13 C.J. 524."

The contract provided in part:

"The sole compensation of the Salesman shall be commissions on goods sold by him in the above described territory as follows:

"(a) On Laboratory furniture, Library furniture, Vocational school furniture, desks, chairs, stools of wood and steel and similar goods as covered by and illustrated and described in catalog F with all revisions, additions and changes.

"It is understood that the intent of the above listing of goods is to include all items which are properly classified as Laboratory, Vocational, Library and Clinical furniture of wood or steel and which are either manufactured by or sold and cataloged by the Company.

"(b) The Salesman's commission on above furniture shall be as per schedule

attached hereto, subject to change according to the conditions of this Industry, excepting when such goods are listed as specials of wood or steel definite stipulations of commissions will be given in the quotation to the Salesman by the Company, or further the Company is at liberty to quote net prices to the Salesman to which the Salesman is to add his commissions."

The items involved were so-called "specials". The defendant did not give definite stipulations of commission in the quotation to the plaintiff nor did the defendant quote net prices to the plaintiff to which the plaintiff could add its commission.

The defendant contended that it quoted the plaintiff a five percent commission as this was a P.W.A. project and because, as Halvorsen said, such a project would not stand more than a five percent commission for the plaintiff. The defendant admits that the plaintiff would not agree to a five percent commission and when Halvorsen was asked: "Was there ever any agreement between Thorp & Martin and Hamilton Invincible as to what the commissions would be on P.W.A. jobs?", he answered, "I cannot answer that. I don't know." He was also asked, "You don't recall?" and he answered, "No, sir."

The defendant does not deny that it owes the plaintiff a commission but claims that the amount it owes to the plaintiff is $1,793.11.

The parties honestly differ as to the amount of the commission.

Under these circumstances, the defendant is bound to pay a reasonable commission. It has not performed its promise in this regard and it is liable in this action and the plaintiff may recover on its third count.

The court was favorably impressed with the testimony of Crosby and his fairness in this transaction. He had been engaged in the school equipment business for about forty-five years. He consented to the defendant's request that the bid should be made in the defendant's name when he had the right to submit it in the name of Thorp & Martin Company. He notified other manufacturers of school supplies whom he represented that he would not submit bids for their products and he so informed the defendant. He believed Embury's statement that the defendant would be fair to the plaintiff on the matter of a commission.

Halvorsen, in defendant's exhibit G, wrote "We could not allow them (plaintiff) their full commission." He did not specify what this full commission was. The dispute on this did not arise until after the defendant had secured the plaintiff's consent that the bid should be filed in the defendant's name. Prior to obtaining this consent, there is nothing in the record to lead the plaintiff to believe that it was not entitled to its full commission.

I find that $3,737.83 is a reasonable commission for the plaintiff on the items manufactured at the defendant's factory in Two Rivers, Wisconsin, to which will be added interest at six percent from the date of the plaintiff's writ, amounting to $438.43, or a total of $4,176.26.

I find that the defendant is entitled to its counterclaim of $500 and this will be deducted from the earned commission.

I direct that judgment be entered for the plaintiff for $3,676.26 and costs.